## Commonwealth vs. Donald H. Stewart, Third.

Worcester. September 9, 2011. - November 10, 2011.

Present: Ireland, C.J., Spina, Cordy, Duffly, & Lenk, JJ.

*Felony-Murder Rule. Robbery. Practice, Criminal,* Instructions to jury, Assistance of counsel, Argument by counsel, Capital case. *Evidence,* Relevancy and materiality. *Malice. Constitutional Law,* Assistance of counsel. *Homicide. Mental Impairment.*

At the trial of an indictment charging murder in the first degree, there was sufficient evidence of armed robbery to support the defendant's conviction of felony-murder, where, even if the jury believed the defendant's claim that he did not steal the victim's truck, there was enough circumstantial evidence for them to conclude that the defendant stole the victim's wallet and clothes. [820-822]

At a murder trial in which the defendant's mental state was relevant to his defense, the judge did not err in instructing the jury to ignore a correction officer's testimony concerning the defendant's transfer to a suicide watch cell, where the officer's testimony concerning his observations of the defendant's behavior and mental state during the transfer, which were critically relevant to the defense, were presented to the jury. [822-823]

There was no merit to a criminal defendant's argument that the judge's instructions on deliberate premeditation at his murder trial did not distinguish between deliberation and premeditation [823-826], or the defendant's argument that the judge's instructions on malice and murder in the second degree would have caused the jury to assume that the malice for murder in the second degree included solely the specific intent to kill [826-828].

At the trial of indictments charging, inter alia, murder in the first degree and armed robbery, where the defendant raised the issue of his capacity to form the requisite intent to commit the specific intent crimes with which he was charged, the judge's proper instructions on mental impairment did not leave the jury with the impression that they could not find murder in the second degree (or manslaughter) if they found the defendant impaired [828-830]; further, the judge's instruction concerning impairment as it affected armed robbery was proper [830-832].

At the trial of indictments charging, inter alia, murder in the first degree and armed robbery, defense counsel's closing argument, in which he pursued an all-or-nothing strategy by arguing that the defendant was not able to form the requisite intent to commit the crimes because he was mentally impaired, was not manifestly unreasonable, where the defendant had confessed to the killing and, therefore, to argue for a conviction of murder in the second degree would have been totally incompatible with his primary defense. [832-833]

INDICTMENTS found and returned in the Superior Court Department on October 15, 2003.

The cases were tried before *Peter W. Agnes, Jr.,* J.

*Stewart T. Graham, Jr.,* for the defendant.

*Stephen J. Carley,* Assistant District Attorney, for the Commonwealth.

IRELAND, C.J. The defendant was convicted of murder in the first degree of the victim, Nicholas Martone, on the theories of felony-murder, deliberate premeditation, and extreme atrocity or cruelty. The defendant also was convicted of armed robbery as the predicate felony and three charges of assault and battery by means of a dangerous weapon.[1] On appeal, the defendant argues that there was insufficient evidence of armed robbery to support his conviction of felony-murder, that there were numerous errors in the judge's instructions to the jury, and that his attorney provided constitutionally ineffective assistance. Because we conclude that no claim of error created a substantial likelihood of a miscarriage of justice, and discern no reason to exercise our power under G. L. c. 278, § 33E, we affirm his convictions.

*Facts and background.* We recite the facts the jury could have found, reserving details for our discussion of the issues raised. The account of the victim's murder came from the defendant's statement to police and the testimony of two of the Commonwealth's witnesses, Mark Bergeron and Shannon Belsito. At the time of the murder, Belsito was the girl friend of the defendant's accomplice, Frank Carpenter.

In May, 2003, the defendant and Carpenter lived with Bergeron in a "storage facility" in Worcester.[2] In the early morning hours of May 5, the victim approached the defendant and Carpenter and asked to buy some drugs. The defendant patted the victim down and took a knife that the victim had in his possession. The victim stayed with the defendant, Carpenter, and Belsito while he smoked "crack" cocaine. At some point, there was a discussion concerning whether, in exchange for drugs, the victim would lend his truck to the defendant for a

---

[1]The defendant was found not guilty of threatening to commit a crime.

[2]Mark Bergeron's stepfather used the facility to store items related to his antique business.

few hours. When the victim declined, the defendant and Carpenter went outside the facility, where Carpenter said that the pair should just take the victim's truck. When the defendant stated that the victim could report it stolen, Carpenter responded that they should kill the victim. The defendant "went along with" this suggestion. The pair returned to the facility and asked the victim to go with them to buy some cigarettes; the victim left with them.

As the men were walking near some railroad tracks, the defendant and Carpenter attacked the victim by grabbing him around the neck, punching and kicking him. The defendant used the victim's knife to stab him and, when the victim was gasping for air, the defendant cut off the victim's belt and used it to strangle him. The victim stopped breathing; the pair then threw his body over a concrete wall, a drop of nine feet.

The pair went back to the facility, and into the bathroom together. They let Belsito in and she saw the defendant "covered in blood." He stated that he had killed the victim with his own knife by stabbing him fifty-one times, and related that he had jumped off a wall onto the victim's chest, cut his neck "so that it opened up bad," and kicked him in the neck while he was gasping for air. He stated that the victim's chest caved in with ribs coming out of his body and that the victim's eyeball came out of its socket.[3]

The defendant asked Belsito to get him a bag and something to cover the victim's body. The pair put their bloody clothes as well as the victim's pants, belt, and sneakers into the bag. The defendant hid the victim's wallet in a ceiling panel at the facility.

The defendant and Carpenter left the facility to cover the victim's body with a sheet Belsito had given them and some plastic roofing material they had found. The pair returned and slept.

When they awoke, the defendant wanted Belsito and Carpenter to leave with him later that day to drive the victim's truck to Florida. As a ruse, Belsito asked the defendant to drive her to a hospital to see her father; Carpenter went with them.

---

[3]The autopsy revealed that the victim was stabbed nine times and, although he had a deep laceration just above his eye and hemorrhaging between his ribs, his eyeball did not come out of its socket and his ribs were not sticking out of his body.

After leaving Belsito to visit her father, the defendant and Carpenter approached Bergeron, and asked him whether he knew where they could get rid of a stolen truck. Bergeron declined to help them. Carpenter then asked whether Bergeron would sell the truck; he declined.

In the early morning hours of May 6, the pair were arrested at an automobile dealership, charged with breaking and entering, and held in custody. Later that evening, Belsito reported the murder to police, who recovered the victim's body, the bag, and the wallet. The police interviewed Carpenter the next morning, and he told them where to find the knife.

Once they had the knife, the police then interviewed the defendant, who confessed and provided details of how the murder was committed. He had the keys to the victim's truck in his possession.

At trial, the medical examiner testified that the victim's death was caused by stab wounds to his neck and blunt head and neck trauma.[4]

The defendant did not testify. He had admitted to police that he participated in the victim's killing but, through witnesses, including a forensic psychologist, cross-examination of the Commonwealth's witnesses, and argument, his defense was that he was so impaired by drug use, that he was not capable of forming the requisite intent to commit murder. The defendant moved for required findings of not guilty at the close of the Commonwealth's case and at the close of all evidence. The judge denied the motions.

*Discussion.* 1. *Felony-murder.* The defendant argues that his conviction of felony-murder was in error because there was no evidence of an armed robbery. We disagree.

---

[4]Because the defendant does not claim that there was insufficient evidence to convict him on the theory of extreme atrocity or cruelty, we need not present details in this regard. However, pursuant to our duty under G. L. c. 278, § 33E, we have reviewed all of the evidence and the findings of the medical examiner concerning the nature and number of wounds to the victim and are satisfied that on that basis alone there was ample evidence that the victim's murder was carried out with extreme atrocity or cruelty. Moreover, the defendant's statements to Shannon Belsito, exaggerating the wounds he inflicted on the victim, see text accompanying note 3, *supra*, reasonably could be seen as taking pleasure in the victim's suffering. See *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983) (factors to consider for extreme atrocity or cruelty include nature of victim's wounds and whether defendant took pleasure in victim's suffering).

In order to make a case for felony-murder, the Commonwealth "need only establish that the defendant committed a homicide while engaged in the commission of a felony." *Commonwealth* v. *Matchett*, 386 Mass. 492, 502 (1982), citing *Commonwealth* v. *Watkins*, 375 Mass. 472, 486-487 (1978). Here, the Commonwealth claimed that the predicate felony to the victim's murder was armed robbery. G. L. c. 265, § 17. *Commonwealth* v. *Tevenal*, 401 Mass. 225, 230 (1987) (armed robbery may serve as predicate for felony-murder). Robbery is "[t]he taking and carrying away of personal property of another from his person and against his will, by force and violence, or by assault and putting in fear, with intent to steal." *Commonwealth* v. *Novicki*, 324 Mass. 461, 464-465 (1949), quoting G. L. (Ter. Ed.) c. 277, § 39. The taking must be with the intent permanently to deprive the person of their property. *Commonwealth* v. *Salerno*, 356 Mass. 642, 648 (1970). "It would be enough that the homicide[] occurred as part of the defendant's effort to escape responsibility for the underlying felony." *Commonwealth* v. *Ortiz*, 408 Mass. 463, 466 (1990), and cases cited.

Here, in his statement to police, the defendant claimed that the victim agreed to lend him the truck in exchange for drugs, and gave the defendant the keys. The defendant also stated that, right after the victim gave him the keys, he left the victim inside the facility and went outside with Carpenter. Carpenter said that the pair should take the victim's truck and the defendant "went along" with the plan to kill the victim so he would not report it "stolen." The defendant further stated that, immediately after this plan was created, the defendant and Carpenter asked the victim to take a walk with them to get cigarettes. The pair did not take the truck until after the victim was killed.

The defendant's argument that there was no evidence of an armed robbery is based solely on his claim in his statement to police that, in exchange for drugs, the victim agreed to lend the defendant his truck and gave him the keys. Relying on his assertion that the truck was already in his possession, the defendant claims that his subsequent intent to steal it was larceny, not armed robbery. We disagree.

The jury reasonably could have concluded that the victim did not voluntarily give the defendant the keys or his truck, relying

solely on the defendant's statement to police. Given that the plan to steal the truck and kill the victim was so close in time to when the victim supposedly gave the defendant the keys, and the fact that the defendant did not use the truck until after the victim was killed, the jury reasonably could have concluded that the defendant was not being truthful about what transpired concerning the keys. The jury reasonably could have found that it was the victim's refusal to lend the truck that caused the defendant and Carpenter to leave the victim inside the facility while they discussed stealing the truck.

There also was other evidence from which the jury could have concluded that the truck was never lent to the defendant. Bergeron testified that "they" asked him whether he knew where to get rid of a "stolen truck." Even though on cross-examination Bergeron stated that it was Carpenter who asked the question, there is no evidence that the defendant contradicted Carpenter's characterization. Belsito testified on cross-examination that she heard the defendant and victim discussing the truck, but that she did not believe "anything was ever exchanged." Moreover, a forensic psychologist the defendant called as a witness testified that the defendant told him that he argued with the victim about the truck because the victim first said he would lend it and then changed his mind, and that during their walk he again argued with the victim. The jury reasonably could have inferred that the second argument had been about the truck.

In any event, the Commonwealth claimed that the wallet and the victim's clothes were also the object of the armed robbery. Therefore, even if the jury believed the defendant's claim that he exchanged drugs for the keys to the truck, there was enough circumstantial evidence for them to conclude that the defendant stole the victim's wallet and clothes.[5]

2. *Instruction on suicide watch.* At trial, a correction officer testified that the defendant was visibly crying during his transfer

---

[5]Because of our conclusion, there is no merit to the defendant's argument that his counsel was ineffective for not specifically objecting to the felony-murder charge after his motion for a required finding of not guilty was denied. See *Commonwealth* v. *Waite*, 422 Mass. 792, 807 (1996) (no ineffective assistance of counsel where trial error created no substantial likelihood of miscarriage of justice).

to a suicide watch cell.[6] When the officer asked why he was crying, the defendant stated that he had "killed a guy on the tracks" with a knife he took from the victim and that he had done it because of drugs. The judge, sua sponte, instructed the jury to disregard the testimony that the defendant was placed on suicide watch because it "doesn't have any bearing on the fact issues that you have to decide in this case, whether [the defendant] was being watched or not is not the issue." The defendant did not object.

The defendant claims that the judge's instruction to ignore the testimony of the suicide watch was erroneous because the defendant's mental state was relevant to his defense, in particular, the voluntariness of his statement to police and the correction officer. We disagree.

"Whether evidence is legally relevant is a question which is generally left to the discretion of the trial judge." Commonwealth v. Chasson, 383 Mass. 183, 187 (1981), and cases cited. Here, the judge's instruction related to the defendant's being placed on suicide watch; the officer's testimony concerning his observations of the defendant's behavior and mental state were admitted.

The cases cited by the defendant do not further his argument because they concern circumstances where the judge did not allow the jury to hear any testimony relating to the defendant's mental state. See Commonwealth v. Sheriff, 425 Mass. 186, 189-190 (1997); Commonwealth v. Gurney, 413 Mass. 97, 100, 102 (1992). Here, the jury heard that the defendant was visibly crying during his interaction with the officer. Thus, the critical evidence concerning the defendant's mental state was presented to the jury. Further, despite the judge's instruction, defense counsel's closing argument highlighted, without objection or further instruction, that the defendant was crying and had been placed on suicide watch. There was no abuse of discretion and no substantial likelihood of a miscarriage of justice.

3. *Jury instructions.* The defendant claims that the judge made several errors and that his counsel was ineffective concern-

_____

[6]The reason the defendant was placed on suicide watch is not clear from the record. The correction officer related a conversation with the defendant that occurred after that determination was made.

ing some of the instructions. In reviewing a claim of error in a jury instruction, the court does not "scrutinize[] bits and pieces [of the instruction] removed from their context." *Commonwealth* v. *Wallis*, 440 Mass. 589, 593-594 (2003), quoting *Commonwealth* v. *Niemic*, 427 Mass. 718, 720 (1998). We "evaluate the charge as a whole, looking for what meaning a reasonable juror could put to the words of the trial judge." *Commonwealth* v. *Waite*, 422 Mass. 792, 804 (1996). In addition, a judge is not required to use exact language "so long as all necessary instructions are given in adequate words." *Commonwealth* v. *Marrero*, 427 Mass. 65, 72 (1998), quoting *Commonwealth* v. *Sarmanian*, 426 Mass. 405, 408 (1998). Where a defendant fails to object to jury instructions at trial, we review the challenged instructions to determine whether the claimed error created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Rodriguez*, 437 Mass. 554, 559 (2002).

We note that the judge provided a written version of the entire charge to the jury and allowed them to refer to those instructions during deliberations.

a. *Instruction on deliberate premeditation.* In order to prove murder in the first degree by deliberate premeditation, the Commonwealth must establish beyond a reasonable doubt that the defendant "reflected on his resolution to kill," and that his "decision to kill was the product of 'cool reflection' " for some short period of time. *Commonwealth* v. *Coleman*, 434 Mass. 165, 167-168 & n.2 (2001), quoting *Commonwealth* v *Ruci*, 409 Mass. 94, 96 (1991), and *Commonwealth* v. *Davis*, 403 Mass. 575, 582 (1988).

The defendant claims that the judge's instruction on deliberate premeditation did not distinguish between deliberation and premeditation. He claims that the instruction did not make it clear that the deliberation had to be the product of rational thought and a weighing of the pros and cons of acting and instead focused on the planning and decision to kill and not on the deliberation. The defendant did not object at trial.

Here, after instructing the jury that murder in the first degree was the unlawful killing done without excuse and with malice, the judge instructed the jury that, under the theory of deliberate premeditation, the Commonwealth had to prove malice beyond

a reasonable doubt by demonstrating "that the defendant actually intended to cause the death of [the victim] in order for the defendant to be found guilty of first degree murder by deliberate premeditation." He further instructed them concerning the Commonwealth's burden of proving deliberate premeditation beyond a reasonable doubt.[7]

These instructions follow the model jury instructions almost verbatim. The defendant makes no argument that the model jury instructions are constitutionally infirm; indeed, he does not discuss the model jury instructions at all. In addition, he ignores the judge's further instruction that the jury should consider "any credible evidence of the defendant's consumption of drugs or his emotional or a mental state on . . . whether he intended to kill [the victim and] . . . whether the defendant deliberately premeditated the killing of [the victim], that is whether he thought before he acted and whether he reached the decision to kill after reflection for at least a short period of time."

The defendant's reliance on *Chambers* v. *McDaniel*, 549 F.3d 1191 (9th Cir. 2008) (*Chambers*), and *Polk* v. *Sandoval*, 503 F.3d 903 (9th Cir. 2007) (*Polk*), is unavailing. In those Federal cases, a Nevada statute defining murder in the first degree required the State to prove beyond a reasonable doubt that a killing was "willful, deliberate and premeditated." *Polk, supra* at 905. However, in each case, the Federal court found that the jury instruction collapsed the separate requirements for murder in the first degree into one, thus relieving the State of its burden of proving all elements beyond a reasonable doubt in violation

---

[7]The judge instructed as follows:

"The Commonwealth has to prove the defendant thought before he acted; that is, [he] decided to kill after some deliberation. The element of deliberation, however, does not require an extended time span, nor does it mean that the deliberation must be accomplished slowly. Rather, it refers to the purposeful character of the premeditation. Deliberation may be a matter of days, hours, or even seconds. It isn't so much time or a matter of time as of logical sequence: first the deliberation and premeditation, then the decision to kill, and lastly the killing in furtherance of the decision. All of this can occur within a few seconds. However, deliberate premeditation excludes acts that are taken so quickly that there's no time to reflect on it and then decide to do it. The Commonwealth must show that the defendant's resolution to kill was at least for some short period of time the product of reflection."

of the defendant's right to due process.[8] See *Chambers, supra* at 1199-1200; *Polk, supra* at 910.

Here, the jury were instructed that the Commonwealth had to prove that the defendant had a specific intent to kill the victim; that the defendant's resolution to kill resulted from reflection over some span of time; and that the act could not have been undertaken so quickly as to preclude such reflection. See note 7, *supra*. See also *Commonwealth* v. *Chipman*, 418 Mass. 262, 269 (1994), quoting *Commonwealth* v. *Tucker*, 189 Mass. 457, 494-495 (1905) (essential point of jury instruction on deliberate premeditation is that it is sequence of thought, "[f]irst the deliberation and premeditation, then the resolution to kill, and lastly the killing in pursuance of the resolution"); *Commonwealth* v. *Jiles*, 428 Mass. 66, 71-72 (1998) (same). In addition, a reasonable jury would have understood that they had to consider the defendant's mental state in determining whether his decision to kill was the product of rational thought. There was no error. In any event, the defendant's statement to police that he "went along with" Carpenter's suggestion that they kill the victim, after which the pair attacked the victim, was sufficient evidence of deliberate premeditation.

b. *Instruction on murder in the second degree.* At trial, when the judge instructed the jury on murder in the second degree, he stated that the Commonwealth had to prove that the defendant committed an unlawful killing with malice. Referring to his instructions on murder in the first degree, the judge then stated, "[Y]ou've heard me describe those two things above, and those two elements together and alone are what make up murder in the second degree . . . The terms 'unlawful killing' and 'malice' were defined above, and I will not repeat them here again. You should refer to those definitions . . . in determining whether or not the Commonwealth has proved the defendant guilty of murder

---

[8] In *Chambers* v. *McDaniel*, 549 F.3d 1191, 1199 (9th Cir. 2008), the jury were instructed at trial that "[t]he nature and extent of the injuries, coupled with repeated blows, may constitute evidence of willfulness, premeditation and deliberation." In *Polk* v. *Sandoval*, 503 F.3d 903, 905 (9th Cir. 2007), the jury were instructed that, if they believed "that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the premeditation is followed by the act constituting the killing, it is willful, deliberate and premeditated murder."

in the second degree." The defendant did not object, but now argues that these instructions concerning murder in the second degree and malice confused the jury so that they were precluded from finding murder in the second degree.

He concedes that the judge properly instructed the jury on malice for deliberate premeditation as the specific intent to kill and properly set forth the three ways the Commonwealth may prove malice, as it pertains to extreme atrocity or cruelty. For murder in the second degree, the three ways the Commonwealth may prove malice are identical to those for extreme atrocity or cruelty.[9] The defendant asserts, in essence, that, because the judge referred back to his previous instructions on malice and did not make clear that the two of the three prongs of malice were not applicable to deliberate premeditation, the jury reasonably could have concluded that they had to find a specific intent to kill for murder in the second degree.

We do not agree with the defendant that the jury would have assumed that the malice for murder in the second degree included solely the specific intent to kill. After properly instructing the jury on malice as it relates to deliberate premeditation and extreme atrocity or cruelty, and instructing that murder committed with deliberate premeditation, or extreme atrocity or cruelty, or committed during the commission of a felony was murder in the first degree, the judge then stated, "Murder which does not appear to be murder in the first degree is murder in the second degree." He repeated this principle three more times, albeit using slightly different language. We conclude that the jury would have taken his reference to his previous definition of malice (as written in the instructions they were provided) to mean that malice for murder in the second degree included all the forms of malice he had set forth.

Moreover, there was no substantial likelihood of a miscarriage of justice because the jury convicted the defendant on all three

---

[9]The three prongs of malice are: an intent to cause death, an intent "to cause grievous bodily harm," or an intent to do an act that, in the circumstances known to the defendant, a reasonable person would have known created "a plain and strong likelihood" of death. See *Commonwealth* v. *Gaboriault*, 439 Mass. 84, 91-92 (2003), quoting *Commonwealth* v. *Azar*, 435 Mass. 675, 681-682 (2002).

theories of murder in the first degree, and for felony-murder, proof of malice is not required "as the felony-murder rule is one of constructive malice." *Commonwealth* v. *Van Winkle*, 443 Mass. 230, 238 (2005).

c. *Instruction on mental impairment.* Because the defendant raised the issue of his capacity to form the requisite intent to commit the specific intent crimes with which he was charged, the judge instructed the jury on mental impairment.[10] The defendant did not object, but now claims that the judge's instruction was error and left the jury with the impression that they could

---

[10]The judge instructed as follows:

"Now, in this case there was evidence, and it will be for you to decide whether to believe it and how much significance to give it. There was evidence about the use of drugs and there was evidence about mental health problems the defendant had and may have had at the time of these events. And what I'm about to say now about drugs or mental health factors applies to all the charges in this case, all six of the charges. Whenever the Commonwealth has to prove the defendant's knowledge or intent, the defendant's culpability or responsibility depends on proof of knowledge or intent. The Commonwealth must prove the required knowledge or intent beyond a reasonable doubt in order to prove the defendant committed the crime. I explained knowledge and intent as they relate to both first and second degree murder above and I'm not going to repeat all of that here. You should consider any credible or believable evidence of the effect on the defendant of his consumption of drugs and any relevant evidence of his emotional or mental state in determining whether the Commonwealth has met its burden of proof with respect to knowledge or intent. More particularly, you should consider . . . any credible evidence of the defendant's consumption of drugs or his emotional or mental state on the following issues: whether the defendant intended to kill or cause grievous bodily harm to [the victim]; whether he was aware that his conduct created a plain and strong likelihood that the death of [the victim] would result; whether the defendant deliberately premeditated the killing of [the victim], that is, whether he thought before he acted and whether he reached the decision to kill after reflection at least for a short period of time; and four, whether the defendant acted in a cruel atrocious manner in causing the death of [the victim]. Now, diminished capacity or impairment due to drugs or mental health problems is not a justification or excuse or defense to crime in Massachusetts. However, credible evidence of such impairment may result in your determination that the Commonwealth has not proved beyond a reasonable doubt that the defendant had the required intent to commit any one or more of the crimes charged in this indictment, namely, murder, armed robbery, assault and battery by means of a dangerous weapon, or threatening to commit a crime. And in that case, the defendant would be not guilty."

not find murder in the second degree (or manslaughter)[11] if they found the defendant impaired. In particular, he states that the judge's instruction that, if the Commonwealth had not proved that the defendant had the requisite intent to commit any of the crimes of which he was charged, he would be not guilty, created that impression.[12] We do not agree.

Before the judge instructed on mental impairment, he had instructed the jury that, concerning "the count charging murder" there were several alternatives they could find as a verdict: not guilty; guilty of murder in the first degree by reason of deliberate premeditation or by extreme atrocity or cruelty or by felony-murder; or murder in the second degree. He further instructed:

> "Under our law, murder is the unlawful killing of a human being with malice. Murder committed with deliberate premeditation and malice is murder in the first degree. Murder committed with extreme atrocity or cruelty and with malice is also murder in the first degree. Murder committed during the commission or attempted commission of a felony punishable by life imprisonment, such as armed robbery, is murder in the first degree. Murder which does not appear to be murder in the first degree is murder in the second degree, and our law says that the degree of murder must be found by the jury."

---

[11]The jury were not instructed on manslaughter; the defendant makes no claim of error.

[12]The defendant makes several arguments concerning the specifics of the instruction. His claims of error are based, at best, on an improper parsing of each phrase out of the context of the entire instructions and, at worst, on a deliberate misreading of the instruction (e.g., he erroneously claims that the judge gave no instruction concerning the effect of mental impairment on armed robbery or felony-murder). See *Commonwealth* v. *Wallis*, 440 Mass. 589, 593-594 (2003), quoting *Commonwealth* v. *Niemic*, 427 Mass. 718, 720 (1998) (court does not scrutinize, out of context, "bits and pieces" of jury instructions). We need not detail his claims here, but have considered them and conclude that they have no merit. See *Commonwealth* v. *Smith*, 449 Mass. 12, 17 (2007), quoting *Commonwealth* v. *Sires*, 413 Mass. 292, 300 (1992) ("All that we have ever required be said to juries about the effect of drug . . . consumption on a defendant's intent or knowledge would be satisfied by a simple instruction that the jury may consider credible evidence of the effects of the defendant's consumption of drugs . . . in deciding whether the Commonwealth had met its burden of proving the defendant's state of mind beyond a reasonable doubt").

Where a judge properly instructs that "mental impairment is a factor to be weighed in the jury's consideration whether deliberate premeditation or extreme atrocity or cruelty existed, . . . he [is] not required to instruct that sufficient mental incapacity can reduce first degree murder to second degree murder." *Commonwealth* v. *Meinholz*, 420 Mass. 633, 637-638 (1995), citing *Commonwealth* v. *Gould*, 380 Mass. 672, 683, 685 (1979). Here, the judge's "instruction that the critical distinction between [murder in the first degree and murder in the second degree] is the existence of deliberate premeditation and extreme atrocity or cruelty amounts to the same thing." *Commonwealth* v. *Meinholz, supra* at 638. Moreover, when the judge was reviewing the verdict forms with the jury he stated that, if the jury found that the Commonwealth had not proved that the defendant committed murder in the first degree on any of the three theories, they would then consider whether the Commonwealth proved murder in the second degree. There was no error and defense counsel's failure to object to the mental impairment instruction was not ineffective assistance of counsel.

In any event, there was evidence on which the jury reasonably could have concluded that the defendant was not so impaired as to negate his intent to commit murder in the first degree. Belsito testified to the interactions she had with the defendant after the murder, including his asking for a sheet to cover the victim's body and a bag to put bloody clothes in, and his hiding the victim's wallet above a ceiling tile. In his statement to police, the defendant also was able to relate the details of how the murder was committed, from which the jury could conclude that he was aware of what he was doing. There was no substantial likelihood of a miscarriage of justice.

d. *Instruction on felony-murder in the second degree.* In his main brief the defendant argues that his counsel was constitutionally ineffective because he did not request an instruction on felony-murder in the second degree based on mental impairment. In his reply brief, the defendant concedes that his argument was flawed because, although mental impairment negates specific intent, it is not specific intent that distinguishes felony-murder in the first degree from felony-murder in the second degree. See *Commonwealth* v. *White*, 353 Mass. 409, 425 (1967), cert. denied,

391 U.S. 968 (1968) (homicide committed during felony not punishable by life imprisonment is felony-murder in second degree). See also G. L. c. 265, § 17 (armed robbery punishable by life imprisonment); *Commonwealth* v. *Tevenal*, 401 Mass. 225, 230 (1987) (armed robbery may serve as predicate for felony-murder in first degree).

However, in his reply brief, the defendant argues, for the first time, that the judge should have instructed the jury that, if they found the defendant mentally impaired as to armed robbery, they could find him guilty of lesser included offenses of assault by means of a dangerous weapon, or assault and battery by means of a dangerous weapon. We do not consider arguments made for the first time in a reply brief. *Commonwealth* v. *Keevan*, 400 Mass. 557, 562 n.4 (1987). Nevertheless, pursuant to our duty under G. L. c. 278, § 33E, we have reviewed this claim and conclude that it has no merit.

It would have been improper for the judge to instruct the jury on assault and battery by means of a dangerous weapon because it is not a lesser included offense of armed robbery. *Commonwealth* v. *Pimental*, 454 Mass. 475, 482 n.6 (2009), citing *Commonwealth* v. *Wolinski*, 431 Mass. 228, 238-239 (2000). In addition, the other charge the defendant asserts could have been made, assault by means of a dangerous weapon, is not a lesser included offense of armed robbery, but of assault and battery by means of a dangerous weapon. *Commonwealth* v. *Appleby*, 380 Mass. 296, 308 (1980).

Even assuming that (unlike assault and battery by means of a dangerous weapon) assault by means of a dangerous weapon is a lesser included offense of murder, the defendant admitted that he committed battery on the victim. Therefore, the judge was not required to give an instruction only on assault where the evidence did not provide a rational basis for acquitting the defendant. See *Commonwealth* v. *Santo*, 375 Mass. 299, 305-306 (1978). Moreover, we conclude that the judge's instruction concerning impairment as it affected armed robbery and murder answered the defendant's concern that the jury were not given an alternative to either convicting him of murder in the first degree or acquittal. We also note that the jury clearly rejected the defendant's impairment defense by finding him guilty of

murder in the first degree on all three theories. There was no substantial likelihood of a miscarriage of justice.

4. *Defense closing argument.* In his closing argument, defense counsel pursued an all-or-nothing strategy by arguing that the defendant was not able to form the requisite intent to commit the crimes with which he was charged because he was mentally impaired due not only to consumption of drugs at the time of the killing but also to his diagnosed conditions of polysubstance abuse and posttraumatic stress disorder. Counsel concluded by stating that the jury should therefore "not find [the defendant] guilty of this charge of murder."

The defendant argues that his counsel was ineffective because he should have discussed mental impairment as it related specifically to murder in the first degree based on premeditation or extreme atrocity or cruelty.[13] He also argues that counsel erred in telling the jury that, if they found impairment, their verdict should be not guilty, and claims that the mental impairment could have only reduced the verdict to murder in the second degree.

Where a defendant has been convicted of murder in the first degree, and raises an ineffective assistance of counsel claim, we review the claim of error to determine "whether there exists a substantial likelihood of a miscarriage of justice, as required under G. L. c. 278, § 33E, which is more favorable to the defendant than is the general constitutional standard for determining ineffective assistance of counsel." *Commonwealth* v. *Frank*, 433 Mass. 185, 187 (2001). Under this standard, we consider "whether there was an error in the course of the trial . . . and, if there was, whether that error was likely to have influenced the jury's conclusion." *Id.* at 187-188, quoting *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). "[W]e give due deference to trial counsel's tactical decisions and do not find ineffectiveness unless those decisions were 'manifestly unreasonable when made.' " *Commonwealth* v. *Fisher*, 433 Mass. 340, 354 (2001), quoting *Commonwealth* v. *Coonan*, 428 Mass. 823, 827 (1999).

We begin by noting that the argument that if the jury found

---

[13]In his closing, counsel mentioned murder as it related only to premeditation.

that the defendant was impaired, the only alternative was to find him guilty of murder in the second degree has no merit. Mental impairment is a defense to both murder in the first degree and murder in the second degree. *Commonwealth* v. *Gaboriault*, 439 Mass. 84, 91-92 (2003), citing *Commonwealth* v. *Hardy*, 426 Mass. 725, 730 (1998). We also do not agree with the defendant that, when defense counsel told the jury to find the defendant not guilty of "murder," he was speaking only of murder in the first degree and excluding the possibility of the jury finding the defendant not guilty of murder in the second degree.

Nevertheless, we address the defendant's claim and assume, arguendo, that the jury understood counsel to refer only to the charge of murder in the first degree. Because the defendant has failed to move for a new trial based on his ineffective assistance claim, there is nothing in the record that would explain his trial counsel's reasons for pursuing this strategy. See *Commonwealth* v. *Peloquin*, 437 Mass. 204, 210 n.5 (2002) (challenge of trial counsel's strategy relying on trial record alone is weak because trial record bereft of trial counsel's explanation). However, we conclude that trial counsel's all-or-nothing strategy was not manifestly unreasonable because the defendant confessed to the killing and his defense was that he did not have the capacity to form the specific intent to commit the crimes charged. To argue for conviction based on murder in the second degree would have been "totally incompatible with his primary defense." *Commonwealth* v. *Andrews*, 427 Mass. 434, 443 (1998). See *Commonwealth* v. *Roberts*, 407 Mass. 731, 739 (1990) ("The defendant wanted an acquittal, not a conviction of a lesser-included crime"). There was no ineffective assistance of counsel.

5. *Review under G. L. c. 278, § 33E.* Although the defendant does not raise a claim seeking relief pursuant to G. L. c. 278, § 33E, we are obligated nonetheless to review the entire record. Having done so, we discern no basis to order a new trial or reduce the murder verdict.

*Judgments affirmed.*